# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DEBRA BOYD,                        )
                                     )

              Plaintiff,       )      Civil Action No. 2:12-cv-00332
                                    )      Judge Nora Barry Fischer

     v.                              )
                                     )

CITIZENS BANK OF PENNSYLVANIA, )
INC.,                            )
                                   )

             Defendant.     )

## MEMORANDUM OPINION AND ORDER

**NORA BARRY FISCHER, District Judge.**

## I. Introduction

This is an employment discrimination case brought by Debra Boyd ("Plaintiff" or "Boyd") against her former employer, Citizens Bank of Pennsylvania, Inc. ("Defendant" or "the Bank"). Plaintiff asserts that Defendant discriminated against her based upon her age and race, and retaliated against her in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 623 *et seq.* ("ADEA"), Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1) ("Title VII"), and the Pennsylvania Human Relations Act, 43 P.S. § 951 *et seq.* ("PHRA").[1]

Presently pending before the Court is the Defendant's Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (ECF No. 81). Upon consideration of the parties' submissions and for the reasons set forth below, the Defendant's Motion will be granted.

---

[1] Plaintiff's Second Amended Complaint further alleges in the "Jurisdiction" section that her claims are also brought pursuant to 42 U.S.C. § 1981. (ECF No. 23 at ¶ 2). This provision prohibits racial discrimination in the making and enforcement of contracts and property transactions. *Brown v. Philip Morris, Inc.*, 250 F.3d 789, 797 (3d Cir. 2001). Here, not only is the Second Amended Complaint devoid of any factual allegations in support of a § 1981 claim, this provision is simply not applicable to the facts of this case.

## II. Background

### *A. Local Rule 56.1 violation*

As an initial matter, the Court notes Plaintiff's failure to properly respond to Defendant's Concise Statement of Undisputed Material Facts as required by the Local Rules of the United States District Court for the Western District of Pennsylvania. Local Rule 56.C.1 mandates that a non-moving party's response to a motion for summary judgment must include:

> **1. A Responsive Concise Statement:** A separately filed concise statement, which responds to each numbered paragraph in the moving party's Concise Statement of Material Facts by:
>
> > **a**. admitting or denying whether each fact contained in the moving party's Concise Statement of Material Facts is undisputed and/or material;
> >
> > **b**. setting forth the basis for the denial if any fact contained in the moving party's Concise Statement of Material Facts is not admitted in its entirety (as to whether it is undisputed or material), with appropriate reference to the record (See LCvR 56.B.1 for instructions regarding format and annotation); and
> >
> > **c**. setting forth in separately numbered paragraphs any other material facts that are allegedly at issue, and/or that the opposing party asserts are necessary for the court to determine the motion for summary judgment.

LCvR 56.C.1. Furthermore, Local Rule 56.E provides as follows:

> **E. Admission of Material Facts.** Alleged material facts set forth in the moving party's Concise Statement of Material Facts or in the opposing party's Responsive Concise Statement, which are claimed to be undisputed, will for the purposes of deciding the motion for summary judgment be deemed admitted unless specifically denied or otherwise controverted by a separate concise statement of the opposing party.

LCvR 56.E.

The Court's Order dated November 4, 2013 explicitly directed the parties to adhere to Local Rule 56.C, and in light of the Plaintiff's *pro se* status, the Court set out the requirements of

2

Local Rule 56.C in its Order. (ECF No. 72).[2] In addition, the Court's Order instructed the Plaintiff that her Response "shall contain a separately filed Concise Statement of Facts that admits or denies each fact contained in Defendant's Motion for Summary Judgment with appropriate citations to the record, … and an Appendix containing any documents that Plaintiff references in her Concise Statement of Facts." (ECF No. 72 at p. 2).

Defendant filed a Concise Statement of Material Facts, containing paragraphs numbered 1 through 263, in support of its Motion for Summary Judgment on December 16, 2013, *see* (ECF No. 85), and filed unredacted portions (paragraphs numbered 162 through 248) under seal on December 18, 2013. (ECF No. 87). Defendant additionally filed an Appendix of Exhibits in Support of its Motion for Summary Judgment. (ECF No. 86). In response, Plaintiff filed a Response to Defendant's Concise Statement of Undisputed Material Facts, but only specifically addressed paragraphs numbered 1 through 61. (ECF No. 92). Despite this Court's Order, many of the Plaintiff's responses simply set forth her view of the "facts" with no supporting citations to the record. (ECF No. 92). Moreover, Plaintiff refused to separately respond, as ordered by the Court, to paragraphs numbered 62 through 263, stating:

> 62-end of Concise statement is ***disagreed, disagreed in parts*** and/***or is NA***. I feel it is not necessary to waste time responding to each statement individually when my position is (*sic*) already been argued.

(ECF No. 92 at pp. 12-13) (emphasis in original).

This Court "requires strict compliance with the provisions of [Local Rule 56]." *E.E.O.C. v. U.S. Steel Corp.*, 2013 WL 625315 n.1 (W.D.Pa. 2013) (quoting *Practices and Procedures of Judge Nora Barry Fischer § II.E.(i), Effective March 23, 2010*, available at http://www.pawd.uscourts.gov/Documents/Judge/fischer_pp.pdf.). We recognize that courts

---

[2] Parenthetically, we observe that Plaintiff was represented by counsel until approximately October 26, 2012, when she informed the Court that she was not. On October 31, 2012, the Court entered an Order allowing Plaintiff until December 3, 2012 to obtain new counsel, and postponed a Motion hearing previously set and stayed fact discovery. (ECF No. 36). On November 26, 2012, the Court granted Plaintiff an extension until January 17, 2013 in which to obtain new counsel. (ECF No. 38). Plaintiff was granted a second extension by the Court on January 16, 2013, and received until February 19, 2013 in which to obtain counsel. (ECF No. 40). Plaintiff's counsel filed a Motion to Withdraw, which the Court granted on February 22, 2013. (ECF Nos. 41, 42). On February 25, 2013, Plaintiff informed the Court during a Status Conference that she would be proceeding *pro se,* and the Court lifted the stay on discovery. (ECF No. 44).

accord *pro se* litigants a certain degree of leniency, particularly with respect to procedural rules. *Mala v. Crown Bay Marina, Inc.*, 704 F.3d 239, 244 (3d Cir. 2013) (quoting *Haines v. Kerner*, 404 U.S. 519, 520, 92 S.Ct. 594, 30 L.Ed.2d 652 (1972)). However, as we recently explained:

> [T]he Court may not be co-opted by a *pro se* litigant to perform tasks normally carried out by hired counsel. *Mala*, 704 F.3d at 244 (citing *Pliler v. Ford*, 542 U.S. 225, 231, 124 S.Ct. 2441, 159 L.Ed.2d 338 (2004)); *Martinez v. Court of Appeal of California, Fourth Appellate Dist.*, 528 U.S. 152, 162, 120 S.Ct. 684, 145 L.Ed.2d 597 (2000). Providing assistance or "[e]xtending too much procedural leniency to a pro se litigant risks undermining the impartial role of the judge in the adversary system." *Id.* (quoting *Procedural Due Process Rights of Pro Se Civil Litigants*, 55 U. CHI. L. REV. 659, 671 (1988)). Moreover, it has never been suggested that "procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel." *Id.* at 245 (quoting *McNeil v. United States*, 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993)). *Pro se* litigants must adhere to procedural rules as would parties assisted by counsel. *Id.* This includes procedural requirements regarding the provision of adequate factual averments to sustain legal claims. *Id.* (citing *Riddle v. Mondragon*, 83 F.3d 1197, 1202 (10th Cir. 1996)).

*U.S. v. Gregg*, 2013 WL 6498249 at *4 (W.D.Pa. 2013).

Accordingly, to the extent Plaintiff's recitation of the facts do not specifically address Defendant's statement of facts, Defendant's statement will be deemed admitted. LCvR 56.E; *Gupta v. Sears, Roebuck and Co.*, 2009 WL 890585 at *3 (W.D.Pa. 2009); *Aubrey v. Sanders*, 2008 WL 4443826 at *1 (W.D.Pa. 2008), *aff'd*, 346 F. App'x 847 (3d Cir. 2009); *Janokowski v. Demand*, 2008 WL 1901347 at *1 (W.D.Pa. 2008). To the extent Plaintiff's statement of "fact" specifically controverts Defendant's, the Court will consider these facts in determining whether summary judgment should be granted.

### B. Facts

### 1. Plaintiff's general employment history with Defendant

Plaintiff was hired by Mellon Bank on June 27, 1983. (ECF No. 85 at ¶ 2, ECF No. 23 at ¶ 10). As a result of a merger, she became an employee of Defendant in the Operations Services department in 2001. (ECF No. 85 at ¶ 3, ECF No. 86-1 at ¶ 4). Although Plaintiff reported to different managers since 2001, her ultimate supervisor, at all relevant times, was Barbara J.

Black ("Black"), the Vice President and Operations Services Manager for Consumer Operations for the Bank. (ECF No. 85 at ¶ 5, ECF No. 86-1 at ¶ 5). Shortly after the merger, Plaintiff became responsible for reconciling payments related to American Express travelers' checks issued by the Bank's branch locations, and she reported directly to Maureen Norman ("Norman"), who, in turn, reported to Black. (ECF No. 85 at ¶¶ 6-7, ECF No. 86-1 at ¶¶ 6-7).

In July 2002, a performance appraisal was conducted by Norman, and Plaintiff received an overall performance rating of 2, which was defined as "Exceeds Most Expectations." (ECF No. 85 at ¶ 156(a), ECF No. 86-9 at pp. 9-10).[3] In August 2003, Norman assigned Plaintiff an overall performance rating of 3, which was defined as "Meets Expectations." (ECF No. 85 at ¶ 156(b), ECF No. 86-9 at pp. 11-15). Plaintiff disagreed with this rating, commenting that she felt like she did "more than what [was] expected of me with my job." (ECF No. 85 at ¶ 156(c), ECF No. 86-9 at p. 15).

In August 2004, Plaintiff received an overall rating of 3 (meets expectations). (ECF No. 85 at ¶ 156(c), ECF No. 86-9 at pp. 17-28). Plaintiff was of the view that she should have been rated higher, stating in the "Employee's Comments" section, "I agree with review, but I feel as though I did exceeding with my work." (ECF No. 85 at ¶ 156(c), ECF No. 86-9 at p. 21). Dissatisfied with her rating, Plaintiff submitted a letter to the Human Resources department stating, *inter alia*:

> I agree with getting a review, but there are important things that should be on my review, and they are not. One of which is I created a screen called IPAX & its purpose is to make corrections that proof & branches have made, when balancing American Express. Also, I confiscated almost $80,000.00 back to the bank. When I wrote on my review (I did exceeding), I would like it to be shown in my records that I exceeded most of my expectations for American Express.

(ECF No. 86-9 at p. 24). Plaintiff subsequently had several meetings with Norman, Black and Debra Kerchner from Human Resources regarding her appraisal rating. (ECF No. 86-8 at p. 15).

---

[3] The Bank used a rating scale of "1" to "5" to evaluate its employees in multiple performance-based categories, which were ultimately averaged into an overall rating, which also utilized the same "1" to "5" scale. (ECF No. 85 at ¶ 155, ECF No. 86-1 at ¶ 42). Prior to 2008, "1" represented the most favorable rating, and "5" was the least favorable. *Id.* The scale was reversed in 2008, with "5" becoming the best rating and "1" becoming the least favorable rating. *Id.*

Plaintiff also contacted and met with Vice President Paul McKinnon. *Id.* Plaintiff reiterated her view that her involvement in creating the IPAX screen and the recovery of $80,000.00 of paid, and not issued American Express items, warranted a rating of 2, "Exceeds Most Expectations." (ECF No. 86-1 at ¶ 54, ECF No. 86-8 at p. 15).

According to Defendant, Plaintiff's characterization of her "creation" of the IPAX screen was inaccurate. Rather, the Bank's IT personnel were in the process of correcting a significant application deficiency in the program, and as part of that effort, IT consulted with several employees in the Operations department, including the Plaintiff, for comments or recommendations for improving the system to meet the department's needs. (ECF No. 85 at ¶ 116, ECF No. 86-1 at ¶ 54, ECF No. 86-8 at pp 15, 18). Defendant informed Plaintiff that her contributions were part of a team effort and included in her job responsibilities. (ECF No. 85 at ¶ 115, ECF No. 86-8 at p. 15). Revisions were made to Plaintiff's performance appraisal as a result of the meeting, but her overall rating remained unchanged and she refused to sign the revised appraisal form. (ECF No. 85 at ¶ 121, ECF No. 86-1 at ¶¶ 55-57, ECF No. 86-8 at pp. 15-17).

In March 2005, Plaintiff was transferred within the Operations Services department to the Pre-Legal unit, and reported to Linda Williams ("Williams"), who reported to Black. (ECF No. 85 at ¶¶ 8, 10, ECF No. 86-1 at ¶ 7, ECF No. 86-8 at p. 1). Plaintiff was responsible for fielding calls from customers, attorneys, the IRS, and others, related to holds, levies, and other legal directives to the Bank. (ECF No. 85 at ¶ 9, ECF No 86-1 at ¶ 7). Plaintiff described this position as being a "phone clerk," wherein she was tasked with gathering information from callers and relaying the information to the Legal unit responsible for the requested action. (ECF No. 85 at ¶ 9, ECF No. 86-13 at p. 5 (Dep. pp. 26-27)). According to Defendant, Plaintiff requested this transfer in order to be eligible to receive incentive awards under the Bank's C-TOPs program, which was an initiative intended to reward employees with nominal sums, rarely in excess of $100.00, based upon the quantity of work performed. (ECF No. 85 at ¶ 8, ECF No. 86-1 at ¶ 7).

On April 10, 2006, Plaintiff was laterally transferred to another position in the Legal unit, wherein her job duties included sorting mail in the morning and processing answers in the

afternoon. (ECF No. 85 at ¶ 11, ECF No. 86-1 at ¶ 8). Plaintiff did not, however, care for this job, and was transferred back to her former position in the Pre-Legal unit on June 10, 2006 pursuant to her request. (ECF No. 85 at ¶ 11, ECF No. 86-1 at ¶ 8, ECF No. 86-9 at p. 7).

In August 2006, Katie Mattern, an Operations Clerk VII, resigned from her position with the Bank. (ECF No. 85 at ¶ 135, ECF No. 86-9 at p. 7). According to Defendant, Plaintiff approached Black and informed her that she was unaware of the opening, and that it was management's responsibility to advise staff of open positions. (ECF No. 85 at ¶ 136, ECF No. 86-9 at p. 7). Black informed Plaintiff that it was the employees' responsibility to review the online postings of available positions. (ECF No. 85 at ¶ 137, ECF No. 86-9 at p. 7). Plaintiff continued to express interest in the position believing it would involve moving from a grade 5 to a grade 7. (ECF No. 85 at ¶ 138, ECF No. 86-9 at pp. 7-8). Black explained to Plaintiff, however, that the job was posted at a grade 5 level, and would be a lateral move for Plaintiff with no increase in pay. (ECF No. 85 at ¶ 139, ECF No. 86-9 at p. 8). According to Black, Plaintiff informed her she was not interested in the position since it was a lateral move. (ECF No. 85 at ¶ 139, ECF No. 86-9 at p. 8). Joshua Wynkoop, who had applied for the position through the Bank's online application system, was hired to replace Ms. Mattern on August 28, 2006. (ECF No. 85 at ¶ 140, ECF No. 86-8 at p. 5).

During this same time frame, several other Operations Clerk V positions opened up in the Legal unit, each of which were available for application through the Bank's online application system. (ECF No. 85 at ¶ 142, ECF No. 86-7 at p. 23). The Bank hired Taneshia Pickett, Gene Trunzo, and Rhonda Moorer to fill these vacancies, and all had applied for the positions using the online application system. (ECF No. 85 at ¶ 143-144, ECF No. 86-7 at p. 23).

On September 26, 2006, Plaintiff contacted Kerchner and stated that there had been two open positions in her department for which she had expressed an interest to her manager, Maggie Thomas. (ECF No. 85 at ¶ 145, ECF No. 86-4 at p. 20). Plaintiff indicated that Ms. Thomas had instructed her to apply online, but she had been unable to access the system. (ECF No. 86-4 at p. 20). Plaintiff stated that it was not her fault that she could not access the system, and was of the view that after 23 years of service she should have been placed in one of the positions. *Id.*

Kerchner directed Plaintiff to access the training modules for instructions on how to apply online. (ECF No. 86-4 at p. 21). Kerchner further informed Plaintiff that service at the Bank did not "entitle" anyone to a particular position "just because they've expressed an interest in it." *Id.*

Plaintiff also conveyed her dissatisfaction with not being selected for a position to Black and Ralph Papa, the Chairman of the Bank at that time. (ECF No. 85 at ¶ 145, ECF No. 86-2 at p. 7). Plaintiff was informed during a meeting on October 27, 2006 that it was her responsibility to apply for the jobs she was interested in online. (ECF No. 86-2 at p. 7). It is undisputed that Plaintiff never submitted an application for either position, but she nonetheless claimed her failure to do so was not her fault. (ECF No. 85 at ¶ 141, ECF No. 86-1 at ¶ 72, ECF No. 86-2 at p. 7, ECF No. 86-7 at p. 23). Plaintiff conceded however, that she did not contact Kerchner for assistance when she encountered difficulty accessing the online system. (ECF No. 86-2 at p. 7).

Plaintiff received an overall performance rating of 3, "Meets Expectations" at her performance evaluation in September 2006. (ECF No. 85 at ¶ 156(d), ECF No. 86-8 at pp. 19-22). In June 2007, she received an overall rating of 2, "Exceeds Expectations." (ECF No. 85 at ¶ 1569(e), ECF No. 86-8 at p. 23). Pleased with this rating, Plaintiff commented "I love this appraisal & I thank you." *Id.*

In January 2008, Plaintiff received an overall performance rating of 3 (meets expectations). (ECF No. 85 at ¶ 156(f)). In January 2009, she received an overall rating of 3 (fully achieved objectives). (ECF No. 85 at ¶ 156(g)). In January 2010, Plaintiff received an overall rating of 3 (fully achieved objectives). (ECF No. 85 at ¶ 156(h), ECF No. 86-9 at p. 5).

On February 5, 2010, Plaintiff contacted the Employee Relations Service Center ("ERSC"), and stated that she strongly disagreed with her overall performance rating of 3 for the 2009 review period. (ECF No. 85 at ¶ 249, ECF No. 86-5 at pp. 11-12). Plaintiff informed Stephanie Arpin ("Arpin"), that she objected to her evaluations in the areas of Quantity (3), Quality (2), and Dependability (2), and was of the opinion that she should have been rated higher in these areas. (ECF No. 85 at ¶ 249, ECF No. 86-5 at p. 11). Arpin investigated Plaintiff's complaints, speaking with Plaintiff's manager, Lisa Hauck ("Hauck"), and ultimately concluded

that Plaintiff's performance rating would stand. (ECF No. 85 at ¶¶ 250-251, ECF No. 86-5 at p. 10).

On July 16, 2010, Plaintiff contacted the ERSC and complained regarding the manner in which the Bank's bereavement policy was applied to her when her granddaughter died. (ECF No. 85 at ¶ 254, ECF No. 86-5 at p. 143). Plaintiff was upset that she only received three days leave while Jamie Wagner ("Wagner"), her manager, had received five days leave upon the death of her mother. (ECF No. 86-5 at pp. 138-139). Arpin discussed the Bank's policy with the Plaintiff, noting that five days of leave were allowed for the death of an immediate family member, which included a spouse or domestic partner, parent, child, sibling or relative living in the same household, and that three bereavement days were allowed for non-immediate family members. (ECF No. 85 at ¶ 257, ECF No. 86-5 at p. 4). Arpin noted that Plaintiff did not agree with the policy but understood it, and Arpin considered Plaintiff's concerns to have been addressed. *Id.*

On November 22, 2010, Plaintiff again contacted the ERSC and spoke with Genny Heffernan ("Heffernan"). (ECF No. 28-5 at p. 3). Plaintiff complained that Black was not assigning her other duties within the department as she requested. *Id.* Plaintiff was informed that management had discretion regarding assignments, but Plaintiff was of the opinion that Black was discriminating against her since she had previously filed an EEOC complaint. *Id.* Heffernan requested that Plaintiff document her concerns in writing, and the ERSC would await her statement before determining the next steps. *Id.* Plaintiff forwarded documents to Heffernan, who in turn referred Plaintiff's complaints to a Tier III specialist,[4] Kristianne Widman-Johnson ("Widman-Johnson") for handling. *Id.* Thereafter, Widman-Johnson advised Plaintiff that her complaints related to her EEOC charge would be handled through the EEOC process, and Plaintiff's complaints would be limited to her dissatisfaction with respect to her 2010 performance evaluation. (ECF No. 28-5 at p. 3).

---

[4] The record does not reveal the nature of this position, but such fact is not material for purposes of disposing of the instant motion.

After meeting with Plaintiff and Wagner, Widman-Johnson concluded on February 10, 2011 that Plaintiff's 2010 performance review was appropriate and that Plaintiff had been treated consistently within the department. (ECF No. 28-5 at p. 1). Plaintiff was informed of this decision on February 17, 2011, but continued to maintain that she was not being evaluated fairly. *Id.*

Less than one week later, Plaintiff again contacted the ERSC on February 23, 2011 and reported that she was being "retaliated against by management through her 2010 review." (ECF No. 28-5 at p. 1). Widman-Johnson noted that Plaintiff had received an overall rating of "successful" on her 2010 review. *Id.* She further noted that Plaintiff had been treated consistently with the department's approach with respect to attendance, and that no retaliation had been found. *Id.* Plaintiff voiced her disagreement with the findings of the investigation. *Id.*

### 2. Circumstances surrounding Plaintiff's termination

From September 2008 until her termination on March 11, 2011, Plaintiff worked as an Operations Clerk in the Legal unit of the Bank's Operations Services department, wherein she reported to Wagner. (ECF No. 85 at ¶ 12, ECF No. 86-1 at ¶ 9). The Operations Clerks in the Legal unit were divided into four task-oriented teams, each of which handled a step in the processing of writs and levies taxed against the Bank's account holders and accounts. (ECF No. 85 at ¶ 13, ECF No. 86-1 at ¶ 10). These four teams included: Holds (including database duties); Answers; Payouts; and Releases. *Id.* Each step in the process served as a check of the work of the team that performed the preceding step. *Id.*

During her tenure in the Legal unit, Plaintiff was primarily responsible for tasks associated with Payouts, which required her to process orders from courts or attorneys to release funds. (ECF No. 85 at ¶ 15, ECF No. 86-1 at ¶ 12). Plaintiff would receive a check from the previous team, compare it against paperwork, make sure the amount was correct and made out to the correct recipient, complete paperwork associated with the payment, and enter all of the relevant information into the system. *Id*. Plaintiff was also trained to perform duties with respect to Holds and Answers, but expressed a lack of interest in performing work for the Answers team. (ECF No. 85 at ¶ 16, ECF No. 86-1 at ¶ 13).

With regard to the Holds team, an Operations Clerk, such as the Plaintiff, was responsible for: (1) placing a hold on the customer's account; (2) contemporaneously entering the levy request into the Bank's internal database, known as the "Legal/Decedent" database; (3) contemporaneously sending a letter advising the customer that a hold had been placed and advising the customer that, within 21 days, the amount identified in the letter would be paid to the IRS as required by law (the letter was generated for transmission to the customer when the entry was made into the Legal/Decedent database); and (4) processing payment to the IRS. (ECF No. 85 at ¶ 17, ECF No. 86-1 at ¶ 14). Hard copies of the notice of the levy, the screen shots of the customer's account data, and the 21-day notice letter were placed in the customer file, along with a Legal Directives Checklist ("Checklist"), which was, according to Defendant, a tracking sheet which identified and certified that each of the steps were done, as they were accomplished. (ECF No. 85 at ¶ 18, ECF No. 86-1 at ¶ 15). The Checklist noted the dates when the hold was implemented, when the information was entered into the Legal/Decedent database, when the 21-day notice letter was sent, and when the payout was due to be made based upon the notice period. (ECF No. 86-1 at ¶ 15). The use of the Checklist was discontinued in February 2011, but was required to be a part of the file prior to that time. *Id.*

On or about February 8, 2011, Black received a phone call from an IRS agent seeking clarification on when the IRS could expect to receive payment on a levy request made in late December 2010. (ECF No. 85 at ¶ 19, ECF No. 86-1 at ¶ 16, ECF No. 86-2 at p. 10). Black informed the agent she would research the issue and personally get back with the agent. (ECF No. 85 at ¶ 21, ECF No. 86-1 at ¶ 17). Because the records showed that the hold on that particular levy had been processed by Plaintiff, Black requested that Plaintiff research the levy in question and report back to her by the end of the day. (ECF No. 85 at ¶ 22, ECF No. 86-1 at ¶ 18, ECF No. 86-2 at p. 10). Late in the day Black telephoned Plaintiff for a status update, and was informed by Plaintiff that she was on the phone with the IRS agent. (ECF No. 85 at ¶ 24, ECF No. 86-1 at ¶ 19). Black instructed Plaintiff to discontinue the call and report to her office. *Id.*

When Plaintiff arrived at Black's office, Plaintiff had not located the file, but thought she may have handed if off to an employee named "Jackie." (ECF No. 85 at ¶ 28, ECF No. 86-1 at ¶ 20, ECF No. 86-2 at p. 10). A colleague named "Phillip," whose responsibilities included processing the general ledger, and who was researching the matter for Plaintiff, located the missing file. (ECF No. 85 at ¶ 26, ECF No. 86-2 at p. 10). The notes in the file indicated that a check had been sent to the IRS on January 24, 2011. (ECF No. 85 at ¶ 27, ECF No. 86-1 at ¶ 21, ECF No. 86-2 at p. 10). However, this date did not match the Legal/Decedent database, which showed that the levy was not received until January 25, 2011. *Id*. Research revealed that it was Plaintiff, and not Jackie, who was responsible for processing the IRS levy, and that in addition to the levy that triggered the IRS telephone inquiry, three other levies had been processed incorrectly. (ECF No. 85 at ¶ 28, ECF No. 86-1 at ¶ 22, ECF No. 86-2 at p. 10).

It was discovered that Plaintiff had placed holds on the customers' accounts on January 3, 2011, but did not send out the 21-day notice letters on the date the holds were placed. (ECF No. 85 at ¶¶ 29, 31, ECF No. 86-1 at ¶ 23, ECF No. 86-2 at p. 10). Plaintiff did not enter any of the four holds into the Legal/Decedent database until January 25, 2011, which was why the database incorrectly indicated that the levies were received on that date, as opposed to the actual date of receipt of January 3, 2011. (ECF No. 85 at ¶ 30, ECF No 86-1 at ¶ 23, ECF No. 86-2 at p. 10).

Black and Wagner subsequently met with Plaintiff regarding the errors with respect to the four levies. (ECF No. 85 at ¶ 33, ECF No. 86-1 at ¶ 25). According to Black, Plaintiff claimed that, when she realized she had forgotten to enter the holds in the Legal/Decedent database, and therefore, neglected to send out the required 21-day notices, she conferred with two of her colleagues, Tia Walker and Laura Noel, who advised her to issue 10-day notice letters instead. (ECF No. 85 at ¶ 35, ECF No. 86-1 at ¶ 26, ECF No. 86-2 at p. 10). On January 26, 2011, Plaintiff sent revised 10-day letters to the four account holders, although one revised letter continued to include the 21-day notice. (ECF No. 85 at ¶ 36, ECF No. 86-1 at ¶ 27, ECF No. 86-2 at pp. 10-11).

Each of the four levy files included the Checklist, which, as previously discussed, was a paper form that tracked each step in the levy process, including the dates when the hold was

implemented, when the information was entered into the Legal/Decedent database, when the 21-day notice letter was sent, and when the payout was due to be made based upon the notice period.  (ECF No. 85 at ¶ 37, ECF No. 86-1 at ¶ 15).  In each levy file the Checklist had been altered.  (ECF No. 85 at ¶ 38, ECF No. 86-1 at ¶ 28, ECF No. 86-2 at p. 8).  Certain dates on the Checklists had been covered with white-out and overwritten with new dates that falsely indicated that the levies had been entered into the Legal/Decedent database on "1/3" (January 3, 2011), and that the notice letters had been transmitted to customers on the same date.  (ECF No. 85 at ¶ 38, ECF No. 86-1 at ¶ 28, ECF No. 86-2 at p. 8, ECF No. 87-1 at pp. 22-25).  However, the levies had not been entered into the Legal/Decedent database and the customer notification letters were not sent out until January 25, 2011.  *Id.*  Due to the errors in processing the levies, a number of customer accounts went into overdraft, resulting in approximately $ 934.00 in fees that had to be rebated to the affected account holders.  (ECF No. 85 at ¶ 32, ECF No. 86-1 at ¶ 24).

The alteration of the Checklists raised concerns that Plaintiff had attempted to conceal her errors by changing the dates on the Checklists.  (ECF No. 85 at ¶ 39, ECF No. 86-1 at ¶ 29).  Accordingly, Black and Wagner turned the matter over to the ERSC, which recommended that the matter be referred to the Bank's Security and Risk Management for further investigation.  (ECF No. 85 at ¶ 40, ECF No. 86-1 at ¶ 30).

On February 24, 2011, Plaintiff was interviewed by Mary Eichinger ("Eichinger"), a Security and Risk Investigator, who prepared a Report of her findings.  (ECF No. 85 at ¶¶ 41-42, ECF No. 86-1 at ¶ 31, ECF No. 86-3 at pp. 3- 4).  In this Report, Eichinger relayed the substance of her interview with Plaintiff:

> On February 24, 2011 Security & Risk … interviewed Debra Boyd.  Debra Boyd stated that on January 3, 2011 she placed holds on several accounts after receiving levy notices.  On the same day she received the levies Debra Boyd was then supposed to send letters to the customers advising of the holds and enter the levies into the database.  Debra Boyd stated that she forgot to send the letters and forgot to enter the levies into the database.  Debra Boyd then stated that approximately three weeks later, on or about January 24, 2011, she found the files and realized that she had failed to enter the information.  She then asked coworkers what she should do.  She was advised to send the customers a 10 day letter and make sure

the dates on the letter matched the database. Debra Boyd stated that she then entered the levies into the database and sent the 10 day letters.

Debra Boyd was then asked to review the four (4) check lists for the customers whose accounts had been placed on hold January 3, 2011. Debra Boyd reviewed the check lists and identified the writing on the check lists as her writing. When asked why the dates had been altered Debra Boyd stated that she did not remember altering the dates. However, Debra Boyd also stated that if she did alter the dates, it would have been done to have the RAMB and data entry dates match the date of the holds. Debra Boyd then advised Security that the check lists for the customers were copies which she had made. She stated that she made a copy of a check list then placed the customers' information on the top of a copy of the same check list. Debra Boyd stated to Security that she believed that she used the same check list for five customers (whose accounts were placed on hold January 3, 2011) not just the four customers presented for her to review. Debra Boyd then stated that she has placed customer's information on copied check lists on prior occasions also.

(ECF No. 86-3 at pp. 3-4).

Eichinger also obtained a written statement from the Plaintiff during her investigation.

(ECF No. 86-3 at p. 4). In this statement, Plaintiff stated:

I explained that I did holds on 1/3 and I went on vac[ation] & when I came back I forgot that I didn't do the database until 1/24 & I asked my co workers what I should do & Laura Noel, Tia Walker, told me to do a 10 day letter, & I did. I also said that the documents were copies that I used on all (4). I also said that Jackie Lockhart did my G/L for me.

(ECF No. 86-11 at p. 25).

According to Black, Eichinger's report suggested that Plaintiff had admitted that she was responsible for generating the Checklists, that she had applied the white-out and inserted the dates for the express purpose of having the data entry dates match the dates of the holds. (ECF No. 86-1 at ¶ 32). Black was of the view that Plaintiff did not want the Checklists to reveal that the entry of the levies into the Legal/Decedent database and the transmission of the notification letters to the customers did not occur on the same day that the holds were placed on the customers' accounts. *Id.*

Thereafter, Black and Courtney Concannon ("Concannon"), an Employee Relations Consultant with the Bank, met with Plaintiff on March 7, 2011. (ECF No. 85 at ¶ 46, ECF No. 86-1 at ¶ 33).[5] According to Concannon's notes of the meeting, when questioned about the discrepancies between the information contained on the Checklist and the database, Plaintiff admitted that she had put the white-out on the Checklist and wrote "1/3" over the white-out, but also stated that she could not recall if she was the person to apply white-out to the forms, or the reason for the white-out. (ECF No. 85 at ¶ 47, ECF 86-1 at ¶ 34, ECF No. 86-2 at p. 9). When questioned by Concannon as to why the Checklist reflected that the levies had been entered into the database on "1/3" when that was not true, Plaintiff stated that she could not recall. (ECF No. 85 at ¶ 48, ECF No. 86-2 at p. 9). Concannon explained to Plaintiff that by indicating that the levies had been entered into the Legal/Decedents database on "1/3" when they were not, Plaintiff had falsified bank records in violation of the Bank's Code of Business Conduct and Ethics. (ECF No. 85 at ¶ 49, ECF No. 86-1 at ¶ 36, ECF No. 86-2 at p. 9). This policy stated, *inter alia*:

> All bank records shall be maintained in accordance with the CFG Accounting Policy and with other applicable accounting policies, procedures and controls. All transactions shall be recorded timely, accurately, completely, and truthfully. Efforts by any employee to conceal or distort information will be considered unacceptable conduct.
>
> Embezzlement, misappropriation of funds or property, or the falsification of any record, account or document may result in immediate dismissal and will be referred to the appropriate law enforcement agencies.

(ECF No. 86-11 at p. 18). Plaintiff was suspended, with pay, and the matter was "reviewed for termination." (ECF No. 86-2 at p. 9).

Relying on the facts developed during the investigation, the Bank concluded that Plaintiff had deliberately falsified the Checklists in an apparent effort to conceal her mishandling of the levies. (ECF No. 85 at ¶ 51, ECF No. 86-1 at ¶ 38). Although the Bank was of the view that Plaintiff's conduct did not rise to the level of criminal conduct, it nonetheless considered her falsification of the dates, in an effort to conceal and/or avoid the consequences of her failure to

---

[5] Concannon participated by telephone, while Plaintiff and Black participated together in Black's office. (ECF No. 85 at ¶ 46, ECF No. 86-1 at ¶ 3).

properly process the levies, to fall squarely within the conduct prohibited by its policy. (ECF No. 85 at ¶ 53, ECF No. 86-2 at pp. 8-25, ECF No. 87-1 pp. 1-68). Therefore, the decision was made to terminate the Plaintiff based upon the falsification of the Checklist in violation of the Bank's Code of Business Conduct and Ethics. *Id.*

Plaintiff was informed of the decision by telephone on March 11, 2011 by Black and Concannon. (ECF No. 85 at ¶ 54, ECF No. 86-1 at ¶ 38, ECF No. 86-2 at p. 9). According to Defendant, during this conversation Plaintiff changed her explanation, stating that the white-out was applied to cover up the date of 1/25/11, but that she was not the individual that applied the white-out, nor did she write in the 1/3 date. (ECF No. 85 at ¶¶ 55-56, ECF No. 86-1 at ¶ 39, ECF No. 86-2 at p. 8). When Concannon pointed out to Plaintiff that during her interview with her she had admitted applying the white-out but was not sure why, Plaintiff denied this, claiming that her "story never changed." (ECF No. 86-2 at p. 9). According to Black, Plaintiff's attempt to recant her prior statements did not change the Bank's decision, and Plaintiff was terminated effective March 11, 2011. (ECF No. 85 at ¶ 58, ECF No. 86-1 at ¶ 40).

According to the Plaintiff, she did not finish her work on January 3, 2011, but did "put a hold" on the accounts, and then placed the unfinished work in her drawer. (ECF No. 93 at ¶ 1). Thereafter, Plaintiff went on vacation for five days. *Id.* at ¶ 3. Plaintiff contends that it was not uncommon for employees not to complete their work in one day, and that "[a]s a team, team members [did] other people's work[.]" *Id.* at ¶¶ 2, 8. Plaintiff denied whiting out or falsifying the Checklist, and contends that she did not "write or put everything on to the checklist that is on it." *Id.* at ¶ 4. Plaintiff avers that she did not "hide the documents," and claims they were removed from the drawer by Wagner and "used" by two other employees on January 3, 2011. *Id.* at ¶ 5. Finally, Plaintiff avers that upon her return to work, the files were not in her drawer and she assumed the work had been done, but they "resurfaced" on or about January 24, 2011 in the drawer undone. *Id.* at ¶¶ 6-7.

### 3. *Plaintiff's administrative filings*

On February 23, 2007, Plaintiff filed a complaint of age discrimination with the Pennsylvania Human Relations Commission ("PHRC"), alleging that the Bank discriminated

against her on the basis of her age when it failed to hire her for a "Release position" in the Legal Department. (ECF No. 85 at ¶ 85, ECF No. 86-15 at pp. 1-5). In this complaint, Plaintiff alleged that she had informed her manager, Black, and her supervisor, Ms. Thomas, of her interest in the position, and had attempted to apply using the Bank's electronic application system. (ECF No. 86-15 at p. 2 ¶¶ 8-9). Plaintiff further alleged that the system had repeatedly rejected her application, which prevented her from applying for the position. *Id.* at ¶ 9. Plaintiff claimed that the position was awarded to a younger applicant (Taneshia Pickett). *Id.* at ¶ 14. Plaintiff was of the view that the Bank's insistence that she apply online, coupled with the hiring of Ms. Pickett (whom the Plaintiff described as being "in her twenties"), supported the conclusion that the Bank discriminated against her on the basis of her age. (ECF No. 85 at ¶ 88, ECF No. 86-15 at pp. 2-3 ¶¶ 14, 17). Plaintiff further alleged that the Bank discriminated against her on the basis of her age when it failed to acknowledge, recognize, or compensate her for creating a computer screen in 2004 that was "still used today to expedite the work of American Express." (ECF No. 86-15 at p. 3 ¶ 19).

On February 1, 2008, the PHRC dismissed Plaintiff's complaint, concluding that the "charge was not substantiated," and informed Plaintiff that it would take "no further action" on her complaint. (ECF No. 86-15 at p. 13).

On May 11, 2010, Plaintiff filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"), asserting race, age and retaliation claims. (ECF No. 85 at ¶ 91, ECF No. 86-15 at pp. 6-14). Plaintiff claimed she was subjected to discrimination on the basis of her race and age, and was subjected to retaliation for her prior PHRC filing. (ECF No. 86-15 at p. 7 ¶ 1). Specifically, Plaintiff alleged that on October 5, 2009, she received a verbal warning from manager Hauck, which demonstrated that she was subjected to "unreasonably inflated performance expectations" that were not applied to "[y]ounger and non-minority employees," namely, Tia Walker and Dara Wilkerson. (ECF No. 86-15 at p. 9 ¶¶ 19-20). Plaintiff further alleged that she received a performance evaluation on January 15, 2010 for the calendar year 2009, which she claimed had been "down-graded, unfairly so, as a direct result of the unreasonably inflated performance evaluation." (ECF No. 86-15 at p. 10 ¶ 21). Plaintiff

stated that the "unreasonably inflated performance expectation and down-graded performance evaluation [were] the direct result of age discrimination as well as retaliation for prior civil rights protected activity." (ECF No. 86-15 at p. 10 ¶ 24). Plaintiff also alleged that she had been denied a promotion opportunity on November 10, 2009 when Dara Wilkerson and Jackie Lockhart were "detailed" to "Holds & Database." (ECF No. 86-15 at p. 10 ¶ 26). Plaintiff claimed this "denial of promotion" was due to age discrimination and retaliation. *Id.* at p. 10 ¶ 27.

The EEOC dismissed Plaintiff's charge on February 25, 2011, based upon the determination that it was "unable to conclude that the information obtained [during the investigation] establishe[d] a violation of the statutes." (ECF No. 86-15 at p. 14).

On April 11, 2011, Plaintiff filed a charge of discrimination with the EEOC asserting race, age and retaliation claims relating to her termination. (ECF No. 86-10 at p. 8). In the "Particulars" section of the charge, Plaintiff averred:

> 1. In approximately May 2010, I filed a charge of discrimination against RBS. In late February 2011, I received notice of right to sue concerning this charge. On March 11, 2011, I was discharged.
>
> 2. The reason given by Jamie Wa[g]ner, Supervisor, and Barbara Black, Manager, for discharging me was falsifying a document.
>
> 3. I believe I have been discriminated against in violation of Title VII of the Civil Rights Act of 1964, as amended, based on my race (Black) and the Age Discrimination Employment Act of 1967, as amended, based on my age (57) and under both statutes in retaliation for engaging in protected activity.

(ECF No. 86-10 at p. 8). Defendant responded to the charge on May 20, 2011 (ECF No. 86-10 at pp. 19-24), and on December 19, 2011 the EEOC dismissed Plaintiff's charge, noting that it was "unable to conclude that the information obtained establishe[d] violations of the statutes," and issued a notice of right to sue to Plaintiff. (ECF No. 86-10 at p. 6).

### 4. *Plaintiff's lawsuit*

Plaintiff instituted this lawsuit on March 19, 2012. (ECF No. 1). Following several rounds of motion practice, Plaintiff filed her Second Amended Complaint on September 4, 2012.

(ECF No. 23).[6]  In the factual portion of this Complaint, Plaintiff alleged that "[f]or nearly a decade" she was routinely and consistently vocal about perceived age and race discrimination, and routinely engaged in protected activity.  (ECF No. 23 at ¶ 19).  The Complaint sets forth a description of events and/or circumstances which she claims evidence discriminatory and/or retaliatory animus by the Defendant.  (ECF No. 23 at ¶¶ 19-71).  Plaintiff chronicles events beginning with her complaints to Black in 2002 regarding the creation of the IPAX screen, and ending with the circumstances surrounding her suspension and ultimate termination in March 2011.  *Id.*

With respect to her claim of age discrimination, Plaintiff alleged that she suffered the following adverse employment actions: "uncorrected harassment (hostility, isolation, lack of support, accusations and comments), denied promotions applied for, untrue performance reviews affecting her pay, and a discharge of employment."  (ECF No. 23 at ¶ 73).  For the failure to promote claim, Plaintiff identified Dara Wilkerson, Teneshia Pickett, Penny Donaldson and Joshua Wynkoop as younger employees who were given positions for which Plaintiff had applied.  (ECF No. 23 at ¶ 75).  Plaintiff further alleged that following her termination, she was replaced by a "younger white employee."  *Id.*

Plaintiff's race discrimination claim is based upon the same adverse employment actions alleged in connection with her age claim.  (ECF No. 23 at ¶ 77).  In addition, Plaintiff alleged that "[w]hite employees were provided positions [she] applied for and a younger white employee replaced her after discharge such as Wynkoop and Jeff Metzger."  *Id.* at ¶ 12.  Plaintiff further alleged that Sue Keller was afforded preferential treatment with respect to performance expectations and discipline on a variety of issues, including "alleged intoxication."  *Id.* at ¶ 80.

In support of her retaliation claim, Plaintiff alleged that she complained to the Bank's ERSC on December 1, 2010 that Black and Wagner were discriminating and retaliating against her.  (ECF No. 23 at ¶ 81).  Plaintiff further alleged that her complaints consisted of a variety of issues, including being denied raises and promotions, and the discriminatory use of vacation days.  *Id*. at ¶ 82.  Plaintiff's complaints were transferred to the Tier III Team, and she continued

---

[6] Plaintiff was still represented by counsel who filed this complaint on her behalf.

to lodge complaints with Widman-Johnson, the Tier III Team Specialist. *Id.* at ¶¶ 84-85. Plaintiff alleged that at the end of January 2011, Widman-Johnson concluded that Black and Wagner had not discriminated against her. *Id.* at ¶ 89. Within a "short proximity of time" after Black and Wagner were cleared by Widman-Johnson, Plaintiff was "immediately" terminated. *Id.* at ¶ 91.

Presently pending before the Court is the Defendant's Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (ECF No. 81). A supporting Brief, Concise Statements of Facts, Appendices, Response to the Concise Statement of Facts, Reply Briefs and Sur-Reply Briefs were also filed by the parties. (ECF Nos. 82-83, 86-87, 91-93, 96, 99, 102-104).[7] The matter is fully briefed and ripe for disposition.

## III.  Standard of Review

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). Pursuant to Rule 56, the Court must enter summary judgment against the party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct 2548, 91 L.Ed.2d 265 (1986). A motion for summary judgment will only be denied when there is a genuine issue of material fact, i.e., if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy v. Stroup*, 413 F.3d 359, 363 (3d Cir. 2005). The mere existence of some disputed facts is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). As to materiality, "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson*, 477 U.S. at 248.

---

[7] The summary judgment record was supplemented by Defendant on May 5, 2014 after it was discovered that an Exhibit, identified as "Citizens000218", was not filed of record although cited to by Defendant in its Concise Statement of Material Facts. (ECF No. 104). Upon review of this Exhibit, it appears that it was, in fact, included as an Exhibit to the summary judgment record, *see* (ECF No. 86-10 at pp. 19-24), but was not identified by the Defendant in the same manner.

In determining whether the dispute is genuine, the court's function is not to weigh the evidence, to determine the truth of the matter, or to evaluate credibility. The court is only to determine whether the evidence of record is such that a reasonable jury could return a verdict for the non-moving party. *McGreevy*, 413 F.3d at 363; *Simpson v. Kay Jewelers*, 142 F.3d 639, 643 n.3 (3d Cir. 1998) (quoting *Fuentes v. Perski*, 32 F.3d 759, 762 n.1 (3d Cir. 1994)). In evaluating the evidence, the court must interpret the facts in the light most favorable to the non-moving party, and draw all reasonable inferences in its favor. *Watson v. Abington Twp.*, 478 F.3d 144, 147 (3d Cir. 2007).

## IV. Discussion

### A. Timeliness issues

Defendant first argues that to the extent Plaintiff's discrimination and retaliation claims are based upon the alleged acts contained in her 2007 PHRC charge and 2010 EEOC charge, her claims are untimely. Under Title VII, a plaintiff wishing to file a complaint in federal court must do so within ninety days of receipt of the EEOC's Notice of Right to Sue. 42 U.S.C. § 2000e-5(f)(1); *see also Burgh v. Borough Council of Borough of Montrose*, 251 F.3d 465, 470 (3d Cir. 2001); *Edwards v. Bay State Milling Co.*, 519 F. App'x 746, 748 (3d Cir. 2013). The same ninety day requirement is applicable to claims asserting an ADEA violation. 29 U.S.C. § 626(e). "[T]he plain language of Section 626(e) makes clear that the failure to file suit within 90 days after the receipt of a notice from the Commission renders a plaintiff's action untimely." *McCray v. Corry Mfg. Co.*, 872 F. Supp. 209, 214, *aff'd*, 61 F.3d 224 (3d Cir. 1995). This ninety day period is "strictly construed" and without the showing of an equitable basis for tolling, "a civil suit filed even one day late is time barred and may be dismissed." *Burgh*, 251 F.3d at 470. Under the PHRA, a plaintiff must file a civil claim within two years of the dismissal of the administrative complaint. 43 P.S. § 962(c)(2) ("An action under this subsection shall be filed within two years after the date of notice from the Commission closing the complaint."); *see also Burkett v. Widener Univ., Inc.*, 70 F. App'x 52, 53 (3d Cir. 2003) (noting that the PHRA has a two year statute of limitations); *O'Neil v. Diocese of Erie*, 2006 WL 3052700 at *5 (W.D.Pa.

2006) (claims for violation of PHRA must be brought within two years of the date administrative complaint is dismissed).

Here, Plaintiff's 2007 PHRA complaint alleged discrimination on the basis of her age when it failed to hire her for a "Release position" and awarded the position to Taneshia Pickett, a younger applicant. (ECF No. 86-15 at pp. 1-5). Plaintiff also complained that she was discriminated against on the basis of her age when the Bank failed to compensate her for creating the computer screen used in processing the work of American Express. *Id.* at p. 3 ¶ 19. In her deposition, Plaintiff pointed to Joshua Wyncoop as an additional individual who was awarded a position she desired. (ECF No. 86-12 at p. 6, Boyd Dep. p. 29). In her Second Amended Complaint, Plaintiff claimed that she was denied positions in the legal department that were awarded to less qualified younger and white employees, namely Stephanie Travers and Jackie Lockheart. (ECF No. 23 at ¶ 19(f)). Plaintiff was issued a notice of dismissal on February 1, 2008. (ECF No. 23 at ¶ 19(f), ECF No. 86-15 at p. 13). Therefore, Plaintiff had until February 1, 2010 to file a complaint based upon her PHRA claims. However, Plaintiff did not file the instant action until March 19, 2012, *see* (ECF No. 1), a period of over two years following the dismissal of her PHRA complaint. (ECF No. 1). Accordingly, any claims related to Plaintiff's 2007 PHRA filing are untimely.

Plaintiff's 2010 EEOC complaint asserted race and age discrimination claims, as well as retaliation claims. (ECF No. 86-15 at p. 7 ¶ 1). Plaintiff's EEOC charge included a narrative of her PHRC charge, and further alleged discriminatory and retaliatory performance expectations and evaluations in the year 2009. (ECF No. 86-15 at pp. 9-10 ¶¶ 19-27). The EEOC issued a Right to Sue notice on February 25, 2011. (ECF No. 23 at ¶ 19(g), ECF No. 86-15 at p. 14). Presuming receipt took place three days after the EEOC mailed it, *see Edwards*, 519 F. App'x at *1, Plaintiff received notice on February 28, 2011, and therefore had until May 31, 2011 to file her complaint.[8] As indicated previously, she did not institute the instant action until March 19, 2012, a period of over nine months after she received notice from the EEOC. Therefore,

---

[8] Ninety days after February 28, 2011 fell on a Sunday, May 29, 2011, and May 30, 2011 was Memorial Day, a legal holiday. Since the period "continues to run until the end of the next day that is not a Saturday, Sunday, or legal holiday," Fed.R.Civ.P. 6(a)(1)(C), the time ran until May 31, 2011.

Plaintiff's Title VII and ADEA claims with respect to her 2010 EEOC filing are also time-barred and the Court finds no basis for applying the equitable tolling doctrine.[9]

To the extent Plaintiff suggests that her claims remain viable under the continuing violation doctrine, the Court rejects this contention. Under this doctrine, a discriminatory act that occurred outside the applicable limitations period may be deemed timely if the plaintiff demonstrates a pattern of discriminatory acts that are not individually actionable and the last act occurred within the limitations period. *See Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114, 122 S.Ct. 2061, 153 L.Ed.2d 106 (2002); *Mandel v. M & O Packaging Corp*. 706 F.3d 157, 165-66 (3d Cir. 2013). The doctrine has no application however, to discrete and complete discriminatory acts and a plaintiff cannot rely on the doctrine to connect untimely claims to a related timely claim. *Morgan*, 536 U.S. at 113 ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges."). Examples of discrete discriminatory acts include, but are not limited to: termination, failure to promote, denial of transfer, refusal to hire, wrongful discipline, denial of training, and wrongful accusation claims. *See O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006); *Gale v. UPMC Horizon*, 2013 WL 5534238 at *8 (W.D.Pa. 2013).

Here, Plaintiff's claims in her 2007 PHRC filing, as well as her 2010 EEOC filing, contain allegations relating to failure to promote and/or transfer, unwarranted performance expectations, and downgraded performance ratings. These are the types of "discrete acts" to which the continuing violation doctrine simply does not apply, and Plaintiff cannot resurrect these untimely claims.

In sum, there is no genuine issue of material fact in dispute regarding the relevant dates with respect to Plaintiff's PHRC and EEOC filings, and her claims are based upon discrete acts for which the continuing violation doctrine does not apply. Accordingly, her claims are time-

---

[9] Equitable tolling stops the statute of limitations from running and may be utilized where: (1) the defendant has actively mislead the plaintiff; (2) the plaintiff has "in some extraordinary way" been prevented from asserting her rights; or (3) the plaintiff has timely asserted her rights mistakenly in the wrong forum. *Oshiver v. Levin, Fishbein, Sedran & Brennan*, 38 F.3d 1380, 1387 (3d Cir. 1994) (citations and quotations omitted). Plaintiff has not asserted an equitable tolling argument in this case and, in any event, none of the criteria for equitable tolling have been met here.

barred as a matter of law and summary judgment will be granted in favor of Defendant with respect to these claims. Evidence relating to these time-barred claims will nonetheless be considered by the Court as background evidence in support of Plaintiff's timely termination claim.

### B. Discrimination claims

The ADEA, Title VII, and the PHRA prohibit discrimination on the basis of age and sex, respectively.[10] In the absence of direct evidence of discrimination, a claim for discrimination under the ADEA and Title VII is analyzed pursuant to the familiar burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).[11] Under the *McDonnell Douglas* burden shifting analysis, a plaintiff carries the initial burden of establishing a *prima facie* case by demonstrating that: (1) she is a member of a "protected class"; (2) she is "qualified for the position"; (3) she "was subject to an adverse employment action despite being qualified"; and it occurred (4) under circumstances that

---

[10] The ADEA prohibits employers from discriminating against individuals in hiring, discharge, compensation, terms, conditions, or privileges of employment on the basis of their age. *See* 29 U.S.C. § 623(a)(1). Title VII likewise prohibits employers from discriminating against individuals on the basis of their race, color, religion, sex, or national origin. *See* 42 U.S.C. § 2000e-2(a)(2). The PHRA also prohibits employment discrimination on the basis of enumerated personal characteristics, including age and race. *See* 43 P.S. §§ 953, 955. Because the ADEA, Title VII and the PHRA have similar purposes and contain parallel provisions, courts use judicial interpretations of Title VII to interpret the ADEA, and in turn use interpretations of both federal statutes in interpreting the PHRA. *See Kelly v. Drexel Univ.*, 94 F.3d 102, 105 (3d Cir. 1996) ("While the Pennsylvania courts are not bound in their interpretations of Pennsylvania law by federal interpretations of parallel provisions in Title VII, the ADA, or the ADEA, … its courts generally interpret the PHRA in accord with its federal counterparts."); *Kocian v. Getty Refining & Marketing Co.*, 707 F.2d 748, 752 n.3 (3d Cir. 1983) (Title VII and the ADEA are construed similarly); *Gottlieb v. Ladd Furniture, Inc.,* 1992 WL 174617 at *5 (E.D.Pa. 1992) (Title VII, the ADEA and the PHRA are given parallel construction). For simplicity's sake, the Court will address Plaintiff's claims solely in terms of ADEA and Title VII law, but our analysis applies with equal force to Plaintiff's PHRA claims.

[11] The Court recognizes that in *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167, 175 n.2, 129 S.Ct. 2343, 174 L.Ed.2d 119 (2009), the United States Supreme Court recently called into question whether *McDonnell Douglas* applies to ADEA claims at all. *Gross*, 557 U.S. at 175 n.2 ("[T]he Court has not definitively decided whether the evidentiary framework of *McDonnell Douglas Corp. v. Green*, utilized in Title VII cases is appropriate in the ADEA context."). However, the Court of Appeals for the Third Circuit has traditionally applied it when discrimination claims are based on the pretext theory, and did not change its practice after *Gross*. *See Johnson v. Delaware County Juvenile Detention Center*, 545 F. App'x 135, 139 (3d Cir. 2031) (finding *Gross* inapplicable when plaintiff's claims are based on a pretext theory); *Connolly v. Pepsi Bottling Group, LLC.*, 347 F. App'x 757, 760 (3d Cir. 2009) (citing *Gross* and upholding district court's application of *Fuentes* and *McDonnell Douglas* to an ADEA case). Accordingly, we continue to apply it.

raise an inference of unlawful discrimination. *Sarullo v. U.S. Postal Serv.*, 352 F.3d 789, 797 & n.7 (3d Cir. 2003) (citing *McDonnell Douglas*, 411 U.S. at 802; *Pivirotto v. Innovative Sys., Inc.*, 191 F.3d 344, 348 n.1, 352, 356 (3d Cir. 1999)) (footnote omitted). The question whether a plaintiff has established her *prima facie* case is a question of law to be determined by the court. *Sarullo*, 352 F.3d at 797.

If the plaintiff successfully establishes a *prima facie* case, the burden then shifts to the employer to articulate some legitimate non-discriminatory reason for the adverse employment action. *Id.* (citing *McDonnell Douglas*, 411 U.S. at 802). Once the employer does so, the burden then shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate reasons proffered by the employer were merely a pretext for discrimination, and not the true motivation for the adverse employment action. *Id.* (citing *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981)).

### 1. Age Discrimination claim

The Court first considers Plaintiff's claim that Defendant terminated her employment because of her age, in violation of the ADEA. To establish a *prima facie* case of age discrimination, a plaintiff must first show that: (1) she is forty years of age or older; (2) the defendant took an adverse employment action against the plaintiff; (3) she was qualified for the position in question; and (4) she was ultimately replaced by another employee who was sufficiently younger to support an inference of discriminatory animus. *Smith v. City of Allentown*, 589 F.3d 684, 689 (3d Cir. 2009) (citing *Potence v. Hazelton Area Sch. Dist.*, 357 F.3d 366, 370 (3d Cir. 2004)).

If a plaintiff is unable to demonstrate that she was replaced by a sufficiently younger individual to permit an inference of age discrimination, a plaintiff can still establish a *prima facie* case under the ADEA by producing other forms of evidence indicating that the challenged employment action was motivated by her age. *Husick v. Allegheny County*, 2010 WL 1903748 at *8 (W.D.Pa. 2010) (citing *Roach v. American Radio Systems Corp.*, 80 F. Supp. 2d 530, 532 (W.D.Pa. 1999)). "If an employer 'terminates an older employee for a reason for which it would not have terminated a younger employee, the age of the older employee's replacement is

immaterial.'" *Husick*, 2010 WL 1903748 at *8 (quoting *Fitzpatrick v. National Mobile Television*, 364 F. Supp. 2d 483, 491, n.4 (M.D.Pa. 2005)). Although the *prima facie* inquiry need not adhere to a rigid formula, a plaintiff cannot shift the burden of production to the defendant simply by expressing a subjective belief that the challenged employment action was motivated by her age. *Wilson v. Blockbuster, Inc.*, 571 F. Supp. 2d 641, 647 (E.D.Pa. 2008).

Here, Defendant does not dispute that Plaintiff can satisfy the first three prongs of the *prima facie* case. (ECF No. 82 at p. 8). Plaintiff was a 57 year-old African-American who was qualified for the Operations Clerk V position she held at the time she was terminated. *Id.* Rather, Defendant contends that Plaintiff cannot meet the fourth prong of the *prima facie* case since it is "undisputed" that her replacement, Toni Deflavis, was three years Plaintiff's junior and was not sufficiently younger to support an inference of age discrimination. *Id.* at p. 9. In support, Defendant cites to its Concise Statement of Undisputed Material Facts, (ECF No. 85 at ¶¶ 60-61), wherein the Bank stated that after Plaintiff's termination, Toni Deflavis was transferred into the Plaintiff's position and she was less than three years younger than Plaintiff. *Id.* As record support for these statements, however, Defendant cited to the Plaintiff's Second Amended Complaint wherein she simply alleged that "a younger white employee replaced her after her discharge." (ECF No. 23 at ¶ 75).

Neither party has referred the Court to any evidence in the record (beyond their own statements in the pleadings) demonstrating the age of Ms. Deflavis. Moreover, the United States Court of Appeals for the Third Circuit has not adopted a bright-line rule as to how much younger the other employee has to be in order to satisfy an age discrimination plaintiff's *prima facie* case. *See e.g., Steward v. Sears and Roebuck & Co.*, 231 F. App'x 201, 209 (3d Cir. 2007) (refusing to adopt a rule that a 6.75 year difference is insufficient); *see also Ramanna v. County of Beaver*, 2008 WL 4204713 at *9 (W.D.Pa. 2008) (plaintiff who was between three and eight years older than similarly situated employees who were retained established a *prima facie* case of age discrimination). Accordingly, the Court will presume, for the purposes of the instant motion, that a *prima facie* case has been established and will consider Plaintiff's claims under the remainder of the *McDonnell Douglas* paradigm.

As previously discussed, Defendant's articulated, legitimate, non-discriminatory reason for terminating Plaintiff was that she falsified bank documents in violation of the Bank's policy in order to conceal her mishandling of four IRS levies she was responsible for processing. (ECF No. 85 ¶¶ 51-53, ECF No. 86-1 at ¶ 38). Courts have repeatedly held that falsifying documents is a legitimate non-discriminatory basis for terminating an employee. *See e.g.*, *Warner v. Federal Express Corp.*, 174 F. Supp. 2d 215, 222 (D.N.J. 2001) (falsification of documents was legitimate non-discriminatory reason for termination); *Thompson v. UPMC Presbyterian Shadyside*, 2012 WL 3245476 at *6 (W.D.Pa. 2012) (falsification of records was a legitimate non-discriminatory reason for termination decision); *Harp v. SEPTA*, 2006 WL 1517390 at *4 (E.D.Pa. 2006) (falsifying documentation was a legitimate non-discriminatory reason for firing employee). The Court is satisfied that Defendant has met its burden of production in this regard.

In order to defeat Defendant's summary judgment motion, Plaintiff must point to some evidence "from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Stanziale v. Jargowsky*, 200 F.3d 101, 105 (3d Cir. 2000); *Brewer v. Quaker State Oil Refining Corp.*, 72 F.3d 326, 331 (3d Cir. 1995).

A plaintiff can establish the first prong by "demonstrat[ing] such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Fuentes v. Perskie*, 32 F.3d 759, 765 (3d Cir. 1994) (quoting *Ezold v. Wolf, Block, Schorr & Solis–Cohen*, 983 F.2d 509, 531 (3d Cir. 1992)). A plaintiff may not, however, "simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Keller v. Orix Credit Alliance, Inc.*, 130 F.3d 1101, 1108-09 (3d Cir. 1997) (quoting *Fuentes*, 32 F.2d at 765). In other words, the plaintiff must show "not merely that the employer's proffered reason was wrong, but that it was so plainly wrong that it cannot have been the employer's real reason." *Keller*, 130 F.3d at 1109.

To satisfy the second prong, the plaintiff must point to evidence "that proves ... discrimination in the same way that critical facts are generally proved—based solely on the natural probative force of the evidence." *Keller*, 130 F.3d at 1111.  The plaintiff can establish the second prong by showing that the employer in the past subjected him to unlawful discriminatory treatment, that the employer treated other, similarly situated persons not within his class more favorably, or that the employer discriminated against other members of his protected class.  *Fuentes*, 32 F.3d at 765.

A review of the Plaintiff's Response to the Defendant's Motion for Summary Judgment (ECF No. 91), Response to the Defendant's Concise Statement of Material Facts (ECF No. 92), Attachments (ECF No. 92-1), Declaration (ECF No. 93), Sur-Reply (ECF No. 99), and Sur-Reply II (ECF No. 103), reveals that her pretext argument is based on the following contentions: (1) that she did not falsify bank documents; (2) that the documents were, in fact, falsified by Black and/or Wagner, who in turn blamed the falsification on her; (3) that younger employees were not terminated for similar misconduct; (4) that younger employees were awarded promotions and she was not; and (5) that she was subject to inflated performance expectations that were not applied to younger employees and her performance evaluations were "downgraded."[12]  The Court will address each of these contentions in turn.

Plaintiff seeks to establish pretext through the first prong by arguing that she did not, in fact, falsify the Checklists with respect to the IRS levies at issue, nor did she admit to falsifying the Checklists during the Bank's investigation.  Plaintiff specifically avers that she "did not white out or falsify the checklist," nor did she "write or put everything on to the checklist that is

---

[12] Parenthetically, the Court observes that a number of the Plaintiff's arguments in her various filings are simply general statements without any specifics and/or citation to the record.  For example, in her Response to the Defendant's Motion for Summary Judgment, Plaintiff generally stated that "many documents gathered during discovery" demonstrated that "most people" promoted over her were younger or white.  (ECF No. 91 at p. 6).  However, the Court is not required to craft arguments, sift through the summary judgment record, and/or locate documents that preclude summary judgment; rather, that is the Plaintiff's burden.  *See Dunkin' Donuts, Inc. v. Patel*, 174 F. Supp. 2d 202, 210 (D.N.J. 2001) ("[I]t is not the Court's obligation to sift through the record searching for a genuine issue of material fact.  Rather, it is the parties' obligation to show the absence or existence of such an issue.") (citation omitted); *see also FedEx Ground Package System, Inc. v. Applications International Corp.*, 2008 WL 4279751 at *13 (W.D.Pa. 2008) (quoting *Dunkin' Donuts*).  Accordingly, the Court's analysis is confined to addressing the Plaintiff's specific arguments supported by documentation contained in the record.

on it." (ECF No. 93 at ¶ 4). Plaintiff further argues that she did not admit to whiting out the Checklists during the Bank's investigation, and that she was under "undue stress" and was "confused" when questioned by the Bank regarding the alteration of the Checklists. (ECF No. 92 at ¶¶ 46-48).[13]

Whether Plaintiff altered the Checklists is of no moment however, since the critical issue is whether the decisionmaker, namely Black, believed that Plaintiff altered the Checklists. It is well-established that Plaintiff's disagreement with her employer's evaluation of her misconduct does not demonstrate pretext. *Billet v. Cigna Corp.*, 940 F.2d 812, 825 (3d Cir. 1991) (holding that employee's "view of his performance is not at issue; what matters is the perception of the decisionmaker"), *overruled in part on other grounds by St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 517-18, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). It is not the function of this Court to determine whether the Bank's business judgment in terminating Plaintiff was correct. *See Watson v. SEPTA*, 207 F.3d 207, 222 (3d Cir. 2000), *cert. denied*, 531 U.S. 1147, 121 S.Ct. 1086, 148 L.Ed.2d 961 (2001). As the United States Court of Appeals for the Third Circuit explained in *Watson*, "if an employer sincerely believes that an employee has stolen company funds and discharges the employee for this reason, the employer should not be held liable under the statutes in question just because it turns out that the employee did not steal the funds and that the employer's reason for the discharge was in this sense not 'true.'" *Watson*, 207 F.3d at 222; *see also Anderson v. Equitable Res., Inc.*, 2009 WL 4730230 at *9 (W.D.Pa. 2009) ("Defendant is not required to show that it was correct in its belief … only that it was reasonable for it to have believed as it did.").

Here, the record reflects that Black was of the view that, based upon the investigation conducted by the Bank, Plaintiff altered the Checklists with white-out in order to have the hold date match the database entry date. Plaintiff seeks to cast doubt on Black's belief in this regard by asserting that it was, in fact, Black and/or Wagner who falsified the Checklists and then

---

[13] Plaintiff further argues that other employees were not required to complete their work on a daily basis, and/or that it was the Bank's policy for other employees to finish another's work. This argument is irrelevant in this particular case however, since Plaintiff was not terminated for failing to complete her work before going on vacation; she was terminated for falsifying bank documents.

blamed it on her.  Scattered throughout her pleadings are various conclusory allegations in this regard, such as:

- "It is a fact that Barb Black, with the help of others maybe, … deliberately took my files out of the draw[er], interfered with the work being done, hid them from me so I would think the work was done, put them back after 21 days and then whited out forms to make it seem like I was fraudulently falsifying bank documents[.]"  (ECF No. 91 at p. 8).

- "Ms. Black did not tell this court is [*sic*] that she took the information out of my draw[er] while I was on vacation, did not allow Linda to complete it as she started to based upon citizens own records, held on to the file until 1/24/2011, altered or whited out information, then put it back into my drawer, and accused me of fraud."  (ECF No. 92 at ¶¶ 19-23).

- "I was framed by Barb Black and I suspect Jamie Wagner."  (ECF No. 92 at ¶ 28).

- "It is Plaintiff's position that on 1/3/2011, Wagner began processing or finishing the work Plaintiff started because she (Wagner) knew it was unfinished and would be late.  Then Wagner and Black adversely decided to not only interfere with the process, but also took the files and hid them from Plaintiff until 1/24/2011 when they stated Plaintiff found them.  More ironically, the files (that Barb Black and Jamie Wagner supervises) just happened to mysteriously reappear back into the drawer, on 1/24/2011.  It is no wonder that I Plaintiff forgot all about that work, when I assumed someone on my team took care of it as I do some of their work."  (ECF No. 103 at p. 2).

Plaintiff does not, however, point to any evidence, beyond her own conclusory and speculative suspicions, from which a reasonable jury could infer that the Bank's reasons for terminating her were pretextual.  *See Ridgewood Bd. of Ed. v. N.E.*, 172 F.3d 238, 252 (3d Cir. 1999) (speculation and conclusory allegations are insufficient to forestall summary judgment), *superceded on other grounds as recognized by P.P. v. West Chester Area Sch. Dist.*, 585 F.3d 727 (3d Cir. 2009); *Fireman's Ins. Co. v. DuFresne*, 676 F.2d 965, 969 (3d Cir. 1982) (non-moving party may not rely merely upon bare assertions, conclusory allegations or suspicions); *Jones v. Hendricks*, 173 F. App'x 180, 183 (3d Cir. 2006) (plaintiff failed to meet his burden of showing that a genuine issue for trial existed where he failed to provide support for his averment

that defendant falsified documents); *Javornick v. United Parcel Service, Inc.*, 2008 WL 4462280 at *7 (W.D.Pa. 2008) (concluding that no reasonable juror would find any evidentiary support for the plaintiff's contention that defendant falsified documents where plaintiff presented no evidence in support of such claim other than her own unsupported accusations).

The Court rejects Plaintiff's contention that the documents she points to in the record raise an inference that Wagner and/or Black falsified the Checklists. For example, Plaintiff points to several documents which she contends shows that other employees, namely "Phillip M. Kamienlecki" and another employee "Marlin Mechanical lic", accessed the Bank's database and tried to complete her work but were somehow thwarted by Black. (ECF No. 91 at p. 3); *see also* (ECF No. 92 at ¶ 42) ("someone was again trying to complete the work named Phillip M Kamlenlecki for me (DB). On 1/3/11, 00081 another person Marlin Mechanical lic was also in the same database. What stopped them? Who stopped them? Only Barb Black could order this"); (ECF No 92-1 at p. 2) (stating that "Phillip M. Kamlenleckl had the files form the drawer on 1/3/11 and 1/4/11").[14] As pointed out by Defendant however, (and subsequently conceded by Plaintiff in her Sur Reply), these are not the names of employees who tried to complete her work, but were, in fact, the names of the Bank customers whose accounts were at issue. (ECF No. 96 at p. 3, ECF No. 99 at p. 3). Accordingly, these documents do not support the Plaintiff's theory raising a genuine issue for trial.

Plaintiff further points to two documents that purportedly show that Wagner was "continuing the exact same job [she] started on 1/3/11." (ECF No. 92 at ¶ 42, ECF No. 92-1 at pp. 7, 29). Plaintiff asserts that these documents, as well as "all of the documents" attached in her Response to the Defendant's Motion, "indicate that on 1/3/11 and 1/4/11 Jamie Wagner processed the same identical customers as I did the holds on (1), Jamie entered the levy requests into the Bank's internal database (2), Jamie generated a letter advising the customer that a hold had been placed and advising the customer that within 21 days, the amount identified will be paid to the IRS (3), and a check was attached by Jamie Wagner on 1/3/11(4)." (ECF No. 99 at pp. 2-3). These two documents include a Levy Acknowledgment and Levy Results checklist in

---

[14] The Court has quoted Plaintiff's pleadings verbatim.

relation to the $59.49 levy and the $80.46 levy, signed by Jamie Wagner. (ECF No. 92-1 at pp. 7, 29). These documents indicate that the date the levy was received was "January 3, 2011," and further contain the notation that a check is attached in the amount of $59.49 and $80.46, respectively. (ECF No. 92-1 at pp. 7, 29). At most, these documents reflect the correct date of the hold, namely, January 3, 2011, (which Plaintiff does not dispute), and do not reflect the date the check was issued to the IRS. Moreover, these documents do not show that Wagner and/or Black entered the levy requests into the Bank's database, and/or generated the letter to the customers, and/or falsified the Checklists.[15] These documents simply do not support the factual assertions they accompany, and therefore no inference of pretext can be drawn.

In sum, Plaintiff's speculative assertions, unsupported by evidence of record, do not demonstrate pretext precluding summary judgment. *See Lexington Ins. Co. v. Western Pa. Hosp.*, 423 F.3d 318, 333 (3d Cir. 2005) ("Speculation does not create a *genuine* issue of fact; instead, it creates a false issue, the demolition of which is a primary goal of summary judgment.") (citation omitted); *Shelton v. University of Medicine & Dentistry of New Jersey*, 223 F.3d 220, 227 (3d Cir. 2000) ("Such speculation is insufficient to raise a fact issue precluding summary judgment.").

Plaintiff next seeks to establish pretext through the second prong by demonstrating that the Bank treated her more harshly as compared to younger, similarly situated employees. "[T]he question of whether other employees are similarly situated is fact-intensive." *Sims v. Court of Common Pleas of Allegheny County*, 2010 WL 3896428 at *4 (W.D.Pa. 2010). At the summary judgment stage, the burden rests with Plaintiff to demonstrate both that she and her chosen comparators are "similarly situated" and that the Bank treated them more favorably than her. *See Warfield v. SEPTA*, 460 F. App'x 127, 130 (3d Cir. 2012). "Though 'similarly situated' does not mean 'identically situated,' a plaintiff must demonstrate that she is similar to the alleged comparator in relevant respects." *Id.* (quoting *Kosereis v. Rhode Island*, 331 F.3d 207, 214 (1st Cir. 2003)). The focus on whether the comparators were treated more favorably focuses "on the

---

[15] The Court observes that in another pleading, Plaintiff argues that Wagner did not complete her processing of the levies and instead took the files and hid them from her. (ECF No. 103 at p. 2). Similar to her other argument, Plaintiff does not cite to any documents in support of this theory.

particular criteria or qualifications identified by the employer as the reason for the adverse action." *Simpson v. Kay Jewelers*, 142 F.3d 639, 647 (3d Cir. 1998); *see also Warfield*, 460 F. App'x at 130 (quoting same). As stated by the United States Court of Appeals for the Third Circuit:

> Context matters in assessing the factors relevant to the inquiry of whether two employees are similarly situated. In this particular context—workplace disciplinary and/or personnel actions—relevant factors include a "showing that the two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them."

*McCullers v. Napolitano*, 427 F. App'x 190, 195 (3d Cir. 2011) (quoting *Radue v. Kimberly–Clark Corp.*, 219 F.3d 612, 617-18 (7th Cir. 2000)) (citation omitted); *see also Nguyen v. AK Steel Corp.*, 735 F. Supp. 2d 346, 361 (W.D.Pa. 2010) (recognizing same general legal principles).

Plaintiff first points to Sydni Rudl, Bruce Mountjoy, and Sue Keller as appropriate comparators who received more favorable treatment than she did under the same circumstances. (ECF No. 92 at ¶ 45, ECF No. 92-1 at pp. 3, 31-34, ECF No. 103 at p. 4, ECF No. 103-1 at pp. 2-5). Plaintiff contends that these employees were either warned and/or placed on a performance improvement plan when they failed to complete their work in a timely fashion, while she was "terminated on the spot." (ECF No. 92-1 at p.3). Plaintiff's reliance upon these employees as comparators, however, is unavailing. First and foremost, while Plaintiff believes these employees should have been terminated for falling behind in their work, the record demonstrates that these employees had not falsified Bank documents in violation of the Bank's Code of Business Conduct and Ethics. The failure to complete work in a timely fashion does not, in our view, equate to an act of falsification of Bank records, and Plaintiff's attempt to use these employees as comparators fails. *See Opsatnik v. Norfolk Southern Corp.*, 335 F. App'x 220, 223 (3d Cir. 2009) (holding that "while 'similarly situated' does not mean identically situated, purported comparators must have committed offenses of 'comparable seriousness'").

33

Moreover, two of the comparators, namely Bruce Mountjoy and Sue Keller, are both members of the same protected class as the Plaintiff; Mountjoy is 54 years old and Keller is 60 years old. (ECF No. 92-1 at p. 35). As this Court concluded in *Anderson*, "[w]ithout any similarly situated employees outside the protected class who were not fired despite engaging in the same prohibited conduct, the Court cannot find that this evidence warrants an inference of discrimination or rebuts Defendant's proffered reasons for Plaintiff's termination." *Anderson*, 2009 WL 4730230 at *13.

Plaintiff further contends that the Defendant's reason for terminating her was pretextual because she was subjected to past discriminatory treatment by the Bank. In support, Plaintiff claims that younger employees received promotions that she did not. (ECF No. 23 at ¶ 75, ECF No. 86-15 at p. 10 ¶ 26). Plaintiff contends that in 2006 she was denied the opportunity to transfer into available, vacant positions in the Legal unit and the jobs were awarded to Taneshia Pickett, a younger African American employee, and Joshua Wynkoop, a younger white employee. However, it is undisputed that Plaintiff never submitted an application for either position (although she claimed her failure to do so was not her fault), nor did she contact Kerchner in Human Resources when she encountered difficulty accessing the system online. (ECF No. 85 at ¶ 141, ECF No. 86-1 at ¶ 72, ECF No. 86-2 at p. 7, ECF No. 86-7 at p. 23). Accordingly, Plaintiff cannot establish pretext by relying on the Bank's alleged failure to promote her to positions for which she did not apply.

Plaintiff claims she was further denied promotional opportunities in 2009 when the Bank allegedly promoted Dara Wilkerson, a younger African-American employee, and Jackie Lockhart, a younger white employee. Plaintiff's contention in this regard however, is also unsupported by the record. It is undisputed that at all relevant times, Ms. Wilkerson and Ms. Lockhart did not, in fact, receive promotions in 2009 when they were "detailed" to the Holds team. They held the same position title as the Plaintiff (Operations Clerk V), and were simply moved to a different function based upon the business needs of the department. (ECF No. 85 at ¶ 102, ECF No. 86-6 at p. 12). Ms. Wilkerson and Ms. Lockhart stayed at the same level and at the same compensation, and their lateral duties did not garner any greater prestige or benefits.

(ECF No. 86-6 at p. 12). Therefore Plaintiff cannot demonstrate that she was subjected to discriminatory treatment on the basis of these assignments.

Plaintiff further claims she was subjected to inflated performance expectations that were not applied to younger coworkers, namely, Tia Walker and Dara Wilkerson, and her performance evaluations were "downgraded." (ECF No. 23 at ¶ 75, ECF No. 86-3 at p. 23 ¶ 20, ECF No. 86-15 at p. 9 ¶¶ 19-20, p. 10 ¶ 21). Plaintiff does not identify the "inflated performance expectations" that she was subjected to that her younger coworkers were not, nor does she point to any evidence in the record in support of such claim. To the extent Plaintiff's claim in this regard is based on the verbal warning she received in 2009 with respect to her attendance, which in turn impacted her 2009 performance rating in the area of "Dependability," the Court rejects such contention. Plaintiff does not dispute that she accrued the absences *see* (ECF No. 86-3 at p. 9), nor has she demonstrated that these two younger coworkers engaged in comparable violations of the Bank's unpaid time off policy. Moreover, Defendant has come forward with unrebutted evidence that seven out of the fourteen coworkers in the same department, who were also the subject of attendance warnings, received a rating of "2" or lower, which was the same rating Plaintiff received. (ECF No. 86-5 at p. 11, ECF No. 86-6 at p. 10). Finally, Defendant has come forward with evidence, which also stands unrebutted, that it applied its unpaid time off policy without regard to age and/or race, by pointing to a forty-eight year old white male employee who was involuntarily terminated after being disciplined multiple times for attendance issues. (ECF No. 85 at ¶¶ 173-182; ECF No. 86-2 at p. 5, ECF No. 86-1 at ¶ 68). Therefore, Plaintiff's effort in demonstrating pretext on this basis is unavailing.

Plaintiff's related argument that Defendant unlawfully discriminated against her in its annual review of her job performance is also not supported by the record. Plaintiff consistently received positive performance evaluations, *see* (ECF No. 85 at ¶ 156, ECF No. 86-8 at pp. 19-25, ECF No. 86-9 at pp. 1-6, 9-10, 17-28, ECF No.86-9 at pp. 3-6), and her contention that she should have been rated higher does not raise an inference of discrimination. *See Billet*, 940 F2d at 825 ("[T]he fact that an employee disagrees with an employer's evaluation [of her performance] does not prove pretext."); *see also Bernhard v. Nexstar Broadcasting Group, Inc.*,

146 F. App'x 582, 586 (3d Cir. 2005) (plaintiff's reliance on his own sworn declaration to contradict defendant's view of his work performance did not raise an issue of pretext).

The Court further finds that Plaintiff has failed to come forward with sufficient evidence in support of her contention that Defendant applied its bereavement policy in a disparate manner. Following the death of her granddaughter, Plaintiff received three days leave while Wagner, a younger employee, received five days leave upon the death of her mother. (ECF No. 86-5 at pp. 138-139). Pursuant to the Bank's policy, five days of leave were allowed for the death of an immediate family member, which includes a spouse or domestic partner, parent, child, sibling or relative living in the same household, and three bereavement days were allowed for non-immediate family members, unless out of state travel was required, and then management discretion would be used on a case by case basis to allow up to five days leave. (ECF No. 85 at ¶ 257, ECF No. 86-5 at pp. 4, 9). Plaintiff conceded in her deposition that the bereavement policy was applied to both she and Wagner as written, but was of the view that her manager should have used her discretion in granting her five days leave. (ECF No. 86-13 at pp. 18-19, Boyd Dep. pp. 219-223). The record is devoid of any evidence, however, that Defendant exercised its discretion in favor of an employee outside of Plaintiff's protected class.

Finally, to the extent Plaintiff contends that pretext has been shown because she was subjected to a hostile work environment on the basis of her age (as well as her race), the Court rejects this contention. Plaintiff has failed to raise a triable issue of fact in this regard in that she has failed to come forward with any evidence, beyond the allegations contained in her pleadings, that would support such an inference. As stated previously, Plaintiff cannot rest on bald allegations to defeat summary judgment, but must come forward with specific facts, by affidavit or by information contained in the record, to support her claim. *See Martonik v. Donahoe*, 2013 WL 5875530 at *9 (W.D.Pa. 2013). Moreover, many of the "hostile" actions alleged, such as her disagreement with her performance evaluations, being chastised for leaving her desk early and not turning off her computer, and leaving a document in the photocopier, are simply managerial functions and not evidence of a hostile environment. *See Fichter v. AMG Resources Corp.*, 528 F. App'x 225, 231 (3d Cir. 2013).

In sum, the Court concludes that Plaintiff has failed to produce sufficient evidence of age-related discrimination to overcome Defendant's summary judgment motion. Accordingly, Defendant's Motion for Summary Judgment as to Plaintiff's ADEA and PHRA claim based on age discrimination will be granted.

## 2. Race Discrimination claim

Plaintiff further believes that she was terminated because of her race, in violation of Title VII. In order to establish a *prima facie* case of race discrimination, a plaintiff must show that: (1) she is a member of a protected class; (2) she was qualified for the position; (3) she suffered an adverse employment action; and (4) similarly situated persons who are not members of her protected class were treated more favorably or that the circumstances of her termination give rise to an inference of discrimination. *Warfield v. SEPTA*, 460 F. App'x 127, 129-30 (3d Cir. 2012) (citing *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 410-11 (3d Cir. 1999)).

Similar to Plaintiff's age discrimination claim, the dispute centers on the fourth prong. Defendant argues that Plaintiff cannot demonstrate that similarly situated employees who were not members of the protected class were treated more favorably. The Court agrees. Plaintiff points to the same comparators in support of her race discrimination claim that she utilized in her attempt to demonstrate that the Defendant's reason for terminating her was a pretext for age discrimination, namely, Sydni Rudl, Bruce Mountjoy, and Sue Keller, as employees who received more favorable treatment than she did under the same circumstances. (ECF No. 92 at ¶ 45, ECF No. 92-1 at pp. 3, 31-34, ECF No. 103 at p. 4, ECF No. 103-1 at pp. 2-5). As discussed in connection with Plaintiff's age claim however, Plaintiff has failed to present sufficient facts from which a reasonable jury could conclude that she was similarly situated to these employees since they did not engage in the same or comparable offending conduct for which Plaintiff was terminated. *Opsatnik*, 335 F. App'x at 223.

Even assuming that Plaintiff has presented a *prima facie* case of race discrimination, Plaintiff relies upon the same arguments and evidence advanced in support of her age claim to support her contention that her termination was racially motivated. As discussed in connection with the Plaintiff's age claim, however, Defendant has offered a well-supported reason for

terminating Plaintiff, and the evidence relied upon by the Plaintiff is insufficient to raise a material issue of fact that the stated reason was a pretext for race discrimination. Accordingly, Defendant's Motion for Summary Judgment as to Plaintiff's Title VII and PHRA claim based on race discrimination will be granted.

### 3. Retaliation claim

Separate provisions of the ADEA, Title VII, and the PHRA specifically prohibit employers from retaliating against employees who complain about age or race based discrimination. *See* 29 U.S.C. § 623(d), 42 U.S.C. § 2000e-3(a), 43 P.S. § 955(d). Plaintiff has the initial burden to present evidence of a *prima facie* case of retaliation. *Moore v. City of Philadelphia.*, 461 F.3d 331, 341-42 (3d Cir.2006). To establish a *prima facie* claim for retaliation, Plaintiff must show that: (1) she engaged in a protected activity; (2) the employer took an adverse action against her; and (3) a causal link exists between the employee's protected activity and the employer's adverse action. *Glanzman v. Metro. Mgmt. Corp.*, 391 F.3d 506, 508-09 (3d Cir. 2004) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279 (3d Cir. 2000)); *see also Carlson v. Twp. of Lower Alloways Creek*, 452 F. App'x 95, 99 (3d Cir. 2011) (citing *Glanzman*). With respect to the adverse action necessary to establish the *prima facie* case, the Supreme Court has specified that a plaintiff "must show that a reasonable employee would have found the challenged action materially adverse, which ... means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (internal quotation marks and citations omitted); *see also Swain v. City of Vineland*, 457 F. App'x 107, 111 (3d Cir. 2012) (citing *Burlington Northern*); *Dreshman v. Henry Clay Villa*, 733 F. Supp. 2d 597, 617 (W.D.Pa. 2010) (applying the "materially adverse" standard in an ADEA retaliation case) (citations omitted). Like the Plaintiff's discrimination claims, if Plaintiff establishes a *prima facie* case, the burden shifts to Defendant "to advance a legitimate, non-retaliatory reason" for its employment decision and, if successful, the burden shifts back to Plaintiff to present sufficient evidence from which a reasonable jury could

conclude that the employment decision was a pretext for retaliation. *Moore*, 461 F.3d at 342 (quoting *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 500-01 (3d Cir. 1997)).

Plaintiff contends that she was terminated in retaliation for her 2007 PHRC complaint, her 2010 EEOC complaint, and her internal complaint to the Defendant's Human Resources department in November 2010. (ECF No. 91 at pp. 1-3, ECF No. 92 at ¶¶ 14, 55-59, ECF No. 103 at pp. 5-6). Defendant does not dispute that Plaintiff engaged in protected activity, nor is it disputed that Plaintiff's termination constituted a "materially adverse" action. Rather, the dispute centers on whether the evidence is sufficient to demonstrate a causal connection between the Plaintiff's filing of her charges of discrimination in 2007 and 2010, as well as her internal complaint in November 2010, and her subsequent termination in March 2011.

In order to show causation, "a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link." *Lauren W. ex rel. Jean W. v. DeFlaminis*, 480 F.3d 259, 267 (3d Cir. 2007). The United States Court of Appeals for the Third Circuit has recognized that a three-month gap between the protected activity and the adverse action cannot, without more, create an inference of causation for summary judgment purposes. *LeBoon v. Lancaster Jewish Community Ctr. Ass'n*, 503 F.3d 217, 233 (3d Cir. 2007) (citing *Clark Cnty. Sch. Dist.*, 532 U.S. 268, 273, 121 S.Ct. 1508, 149 L.Ed.2d 509 (2001)). Following this reasoning, this Court has concluded that intervening periods of two or three months, *see Urbanic v. Donahue*, 2013 WL 1149914 at *5 (W.D.Pa. 2013), and five months, *see Lamarca v. Verizon Pa., Inc.*, 2010 WL 2044627 at *9 (W.D.Pa. 2010), were insufficient to establish suggestive temporal proximity.

Here, the Court finds the evidence is likewise deficient to show that the timing between the events alone can be used to support Plaintiff's *prima facie* case. Plaintiff's first charge of discrimination was filed with the PHRC in February 2007, four years before termination, and her second charge of discrimination was filed with the EEOC in May 2010, ten months before her termination in March 2011. (ECF No. 85 at ¶¶ 85, 91, ECF No. 86-15 at pp. 1-14). Plaintiff's internal complaint to Heffernan in the Bank's ERSC in November 2010 occurred four months

before her termination. (ECF No. 28-5 at p. 3). This timing is also not "unusually suggestive" to raise an inference of causation.

Absent temporal proximity, the Third Circuit permits the use of "circumstantial evidence of a 'pattern of antagonism' following the protected conduct" to raise an inference of causation. *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997) (quoting *Robinson v. Southwestern Pa. Transp. Auth.*, 982 F.2d 892, 895 (3d Cir. 1993)). A causal connection may be established, for example, when a plaintiff experiences a "constant barrage of written and verbal warnings … and disciplinary action, all of which occur[ ] soon after plaintiff's [protected activity] and continue [ ] until his discharge." *Robinson v. SEPTA*, 982 F.2d 892, 895 (3d Cir. 1993). Timing and proof of antagonism are not the only methods by which a plaintiff can make out a *prima facie* showing of causation. As stated by the United States Court of Appeals for the Third Circuit in *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 281 (3rd Cir. 2000), "it is causation, not temporal proximity [or evidence of antagonism], that is an element of [p]laintiff's prima facie case, and temporal proximity [or antagonism] merely provide an evidentiary basis from which an inference [of causation] can be drawn." *Farrell*, 206 F.3d at 281 (quoting *Kachmar*, 109 F.3d at 178). Thus, other circumstantial evidence can support an inference of causation, such as inconsistent reasons by the employer for the adverse action, differential treatment of other employees, inconsistencies in the defendant's testimony, and refusals to provide a reference for the plaintiff. *Farrell*, 206 F.3d at 280-81. In sum, there are "no limits on what [courts can] consider" in determining whether the causation requirement has been satisfied. *Id.* at 281.

Plaintiff does not specifically cite to any instances of an alleged "pattern of antagonism" in support of her claim. To the extent Plaintiff is of the view that the verbal warning she received in 2009 with respect to her attendance evidences antagonism, the Court disagrees. "One act does not constitute a 'pattern' of antagonism." *Washco v. Federal Express Corp.*, 402 F. Supp. 2d 547, 560 (E.D.Pa. 2005); *Disilverio v. Service Master Professional*, 2007 WL 1029759 at *11 (W.D.Pa. 2007) ("one incident does not make a pattern of retaliatory antagonism"). In addition, the occurrence of disciplinary action following protected activity does not establish a pattern of

40

antagonism. *Weston v. Pennsylvania*, 251 F.3d 420, 432-33 (3d Cir. 2001), *overruled in part on other grounds by Burlington N. & Santa Fe Ry. Co.*, 548 U.S. 53, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (two suspensions imposed for attendance violations did not establish a pattern of intervening antagonism when other employees were similarly disciplined).

Plaintiff does, however, rely upon the same acts as alleged in support of her ADEA and Title VII discrimination claims. The Court has already addressed Plaintiff's arguments in this regard, finding no evidence from which a reasonable jury could conclude that the Defendant terminated the Plaintiff on the basis of her age and/or race, and we reach the same result with respect to her retaliation claim.[16] Given the lack of temporal proximity, as well as any evidence of a "pattern of antagonism" or other evidence gleaned from the record as a whole, Plaintiff's *prima facie* case of retaliation fails.[17] Consequently, summary judgment will be granted on Plaintiff's ADEA, Title VII and PHRA retaliation claims as well.

## V. Conclusion

In sum, and for the reasons set forth above,

IT IS HEREBY ORDERED that Defendant's Motion for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure (ECF No. 81) is GRANTED. An appropriate Judgment follows.

*s/ Nora Barry Fischer*
Nora Barry Fischer
United States District Judge

Date:   May 22, 2014

---

[16] The Court acknowledges that our discussion of the evidence with respect to the Plaintiff's ADEA and Title VII claims was under the pretext phase of the burden-shifting paradigm. Because the pretext inquiry and a plaintiff's *prima facie* case often overlap however, the Court may consider the same evidence at both stages of the *McDonnell Douglas* analysis. *See Doe v. C.A.R.S. Protection Plus, Inc.*, 527 F.3d 358, 370 (3d Cir. 2008) ("nothing about the *McDonnell Douglas* formula requires us to ration the evidence between one stage or the other").

[17] Alternatively, even if a *prima facie* case had been established, summary judgment would also be appropriate on the basis of Plaintiff's failure to have raised a triable issue of fact relative to pretext for the same reasons discussed in connection with Plaintiff's ADEA and Title VII claims.

cc: Debra Boyd
112 Auriles Street
Duquesne, PA  15110
(via regular and certified U.S. mail)

Counsel of Record